## OSCAR PARK et al.

*v.*

## THE MODERN WOODMEN OF AMERICA et al.*

*Opinion filed October 16, 1899.*

1. STATUTES—*title of act which suggests subject matter is sufficient.* If the title of an act suggests its subject matter it sufficiently expresses parts of the act incident to and reasonably connected with the subject indicated.

2. SAME—*when act is not special legislation.* An act is not special legislation because it is directed to a particular subject, if it includes all persons that may be within the particular class to which the subject applies.

3. CONSTITUTIONAL LAW—*section 10 of act of 1897, on fraternal beneficiary societies, is not unconstitutional.* The legalizing clause of section 10 of the act on fraternal beneficiary societies, as amended in 1897, (Laws of 1897, pp. 237, 238,) which validates former action by benefit societies at meetings held outside the State, is valid, and not unconstitutional as not being sufficiently indicated in the title of the act or as being special legislation.

4. LEGISLATURE—*power of legislature to enact curative laws.* The legislature may, by curative legislation, render valid acts of a fraternal benefit society done under a supposed power and authority, where the acts are not, in and of themselves, jurisdictional with respect to the rights of person and property, and are such as might originally have been authorized by legislation.

5. BENEFIT SOCIETIES—*charter members of order of Modern Woodmen have no special rights.* The charter members of the order of Modern Woodmen have no rights which are not common to the other members of the society.

6. SAME—*directors may change location of head office when authorized by two-thirds vote.* The directors of a benefit society authorized to amend its articles of association when directed to do so by a two-thirds vote of its legislative body, may, in conformity therewith, change the location of the principal office, and such action is valid and binding on the members of the association. (*Bastian* v. *Modern Woodmen,* 166 Ill. 595, distinguished.)

7. SAME—*contract by promoters is not binding in absence of ratification.* A benefit society or other corporation is not liable, in the absence of ratification, upon a contract made by its promoters before its incorporation, as to the location of the principal office.

*With this case are considered *Bastian* v. *Modern Woodmen of America,* *City of Fulton* v. *Same,* *Bennett* v. *Same,* and *Baker* v. *Same.*

8. Same—*a society cannot be required to perpetually perform contract respecting location of principal office.*  Subsequent members cannot be precluded or the society be prejudiced by requiring it perpetually to perform a contract as to the location of its principal office, entered into by its promoters and ratified by the society, since compensation may be had in damages for a violation of such contract.

9. Same—*head office may be moved without consent of all the members.* The principal office of a benefit society may be removed, by direction of its legislative body, for the general good of the association and for the accommodation of a great majority of its members, although all of them do not give consent thereto.

10. Actions and defenses—*when a city cannot sue in its name for benefit of citizens.*  A city is not authorized to sue in its name in behalf of its citizens to enforce a contract made by promoters, in consideration of donations by residents, that the principal place of business of a corporation should be located in such city.

11. Appeals and errors—*when denial of motion for change of venue is not reviewable on appeal.*  The denial of a motion for a change of venue, made at the time a temporary injunction was dissolved, is not reviewable on appeal from a decree dismissing the bill for want of equity, rendered at a subsequent hearing after the intervention of a term of court, and when the certificate of evidence does not show the facts on which the court acted

Appeal from the Circuit Court of Whiteside county; the Hon. Hiram Bigelow, Judge, presiding.

On July 2, 1897, Anthony W. Bastian and others filed their bill in the circuit court of Whiteside county, in behalf of themselves as well as all others likewise situated, alleging they were members of the Modern Woodmen of America and residents of this State, in good standing. They set out the incorporation of the society and the location of the principal office at Fulton, and alleged the adoption of by-laws of 1890 and 1895, referred to in *Bastian* v. *Modern Woodmen of America*, 166 Ill. 595.   The bill charges that certain officers and delegates who constitute the "Head Camp" have combined and confederated to illegally remove the principal office from Fulton to Rock Island, Illinois, and charges that at the meeting of June 1, 1897, at Dubuque, Iowa, and at Madison, Wisconsin, in 1895, they assumed to transact business pertaining to the affairs of the corporation, and at such meetings pro-

vided for the adoption of acts and resolutions "affecting a removal of such chief office." The bill alleges that the head camp of the Modern Woodmen are illegally assuming to be the society, and charges that the corporation has not at any time provided for the meeting of its legis- lative or governing body in any other State or territory than the State of Illinois, and claims that section 10 of "An act to amend an act entitled 'An act to provide for the organization and management of fraternal beneficiary societies for the purpose of furnishing life indemnity or pecuniary benefits,'" etc., approved and in force May 27, 1897, is null and void; avers that no notice was given by any officer of the association that the alleged meeting at Dubuque would entertain an attempt to submit to the head camp a proposition to change the location of its principal office, and prays that they may be perpetually enjoined from removing the principal office, etc.

On July 27, 1897, Oscar Park and others filed another bill in the same court, alleging they were members of the corporation since the time of its incorporation, and were members of Forest Camp No. 2, one of the subordinate bodies, and alleging the incorporation and location of the principal office at Fulton. It recites the organization of the society at Lyons, Iowa, in 1883, and that it became necessary that financial and other assistance should be had by the society to secure its further existence; that the head officers proposed to the citizens of Fulton, Illinois, that if they would donate or contribute certain sums of money to obtain and pay for a charter and seal, furnish an office for their principal place of business for one year, pay the salary of the head physician for one year, and contribute to the society necessary sums of money until it should be of sufficient strength to meet its ordinary bills arising in due course of business, the head office should be located at Fulton; that this proposition was made by Joseph C. Root, head consul; that on compliance with these conditions the Modern Woodmen would

become organized under the laws of Illinois and establish its principal place of business in said city; that this proposition was agreed to by the citizens, who made certain contributions and donations.   The bill then alleges the proceedings of the head camp held at Dubuque, and the legislation under which such proceedings were had, substantially as in the first bill, and prays for injunction.

On the twenty-sixth of August, 1897, the city of Fulton filed a bill alleging that it is a municipal corporation of Whiteside county, Illinois, and that the Modern Woodmen of America became incorporated as alleged in previous bills, and in its articles of association the complainant was named as the place of its principal office. The origin of the society; its existence at Lyons, Iowa; its removal to Fulton, Illinois; the proposition of Joseph C. Root, the head consul; the acceptance by citizens of Fulton thereof; the subsequent incorporation of the association under the laws of the State of Illinois; the furnishing of a building for an office, and the furnishing of necessary furniture, stationery, seal, books and papers, and the services of a head physician, are alleged, and that the head camp, at their meeting at Madison, Wisconsin, were attempting to move the head office. The bill prayed for an injunction. Subsequently, in September, 1897, Parker J. Bennett filed a bill of a similar character to that last named, alleging substantially the same facts and with a prayer for the same relief.   On September 24, 1897, Leroy Baker filed his bill against certain appellees, alleging substantially the same facts alleged in the former bills.

To these several bills answers were filed by the several defendants thereto, which substantially admit the original organization at Lyons, Iowa; the organization of Forest Camp as one of the local camps; the organization of the corporation, with the adoption of by-laws; the location of its principal office at Fulton. The answers aver that the location of its principal office had been changed by lawful act of the order; deny that the head office was

established or maintained in pursuance of any contract
or agreement made by the corporation; aver that if any
agreement was made as charged, it was not binding or
of legal force on the order to prevent it from removing
its head office when the good of the order required the
same, and that under the law of this State governing fra-
ternal orders, passed since the organization of the order, ·
any such agreement, if made, has long since become void
and of no effect; that at a meeting held at Omaha, in 1892,
by the head camp, the location of the principal office was
legally· changed from Fulton to Rock Island; that the
same thing was done at a meeting held at Madison, Wis-
consin, in 1895, and again at a meeting held at Dubuque,
Iowa, June 1, 1897; deny that it was incorporated at the
· time it is claimed J. C. Root made the contract with the
citizens of Fulton, and deny that he was an officer of
defendant corporation; deny that such contract, if any
was made, was ever ratified by the corporation; deny that
any compensation to a head physician was made by com-
plainants or any other persons mentioned, as alleged in
the bill; deny there was any obligation on the part of the
corporation to pay any salary to any person mentioned
in the bill as head physician or to furnish an office room,
or if any such compensation or contribution was made by
any of the complainants or any other person, as alleged,
that it was in liquidation of any obligation of the incor-
poration; aver that defendants have no knowledge or
information concerning any alleged contributions, and
neither admit nor deny the same. The answers set forth
the time of incorporation, and aver that in the year 1893
the corporation was re-organized under the laws of the
State of Illinois in force June 22, 1893, and aver the
amendment made by the legislature on May 27, 1897, of
the act of June 22, 1893; allege that on June 1, 1897, the
corporation was organized and doing business under said
statute in force June 22, 1893, and that on June 1, 1897,
the corporation had in force a by-law as follows: "The

articles of association of this corporation may be changed at any regular session of the head camp, by resolution designating and setting forth the change sought to be made; said resolution to be adopted by at least two-thirds of the members present at the said head camp and entitled to vote thereat." The answers set forth the amendatory act of 1897, and the resolution adopted at the meeting at Dubuque, Iowa, in June, 1897; aver that afterwards, on June 3, 1897, the by-laws of the corporation were amended by naming Rock Island as the place of its principal office, and the filing of a certificate of such change of the by-laws with the proper officers within sixty days from June 5, 1897, and aver that the removal of the head office was authorized by the laws of this State and the law of the order. The answers were sworn to. Supplemental bills were filed to certain of these bills, to which answers were filed, and to the several answers replications were filed.

On August 13, 1897, an order dissolving the preliminary injunction granted on the first two bills was entered in vacation by a judge of the circuit court on the hearing on bills, answer, replication and affidavits. The injunctions in both those cases had been granted by the master in chancery. On the same day on which the order dissolving those injunctions was filed another bill for injunction was presented to the master, who ordered a temporary injunction, to which answer and replication were filed, and on motion were heard before the same circuit judge who had dissolved the preceding injunctions, and an order was entered dissolving the injunction in that case. No appeal, however, was taken from the final order in that case. The bill by the city of Fulton, filed on the twenty-sixth day of August, 1897, had been presented to the same master who granted the previous temporary injunctions, and on the coming in of the answer and affidavits a motion to dissolve the injunction was entered in vacation, and an application for a change

of venue was made by the complainants and denied on the hearing of that motion, and an order dissolving the preliminary injunction was entered on September 6, 1897 The bill by Parker J. Bennett was then filed, and a motion to dissolve the injunction granted on that bill by the master was brought before the same judge, who on the twenty-fifth of September, 1897, sustained the motion and entered an order dissolving the temporary injunction. On the twenty-fourth day of September, 1897, the master granted a temporary injunction on the bill of Leroy Baker. To this latter bill the defendants gave notice that on the thirtieth day of September they would appear before Judge Gest, at Rock Island, and move to dissolve the injunction. On the twenty-ninth day of September counsel for complainants presented a petition to Judge Gest for a change of venue, which he declined to then entertain, and on the following day, at Morrison, in Whiteside county, he entered an order dissolving the injunction.

The five bills heretofore abstracted and referred to remained on the docket for hearing, and on the twenty-first day of March, 1898, it being one of the judicial days of the January term of the circuit court of Whiteside county, an order was entered consolidating these several causes by agreement of the parties, and on hearing the bills were dismissed for want of equity and the complainants therein prayed an appeal to this court.

The complainants assign errors for dismissing the several bills, respectively; in not declaring the act of June 22, 1897, invalid; and of the circuit judge in denying the motion for a change of venue on the hearing of the motions to dissolve the temporary injunctions.

James DeWitt Andrews, Charles C. McMahon, and Samuel M. McCalmont, (William Barge, of counsel,) for appellants:

It is a franchise for a number of persons to be incorporated and subsist as a body politic. *Regents* v. *Williams,*

9 G. & J. 365; *California* v. *Railway Co.* 127 U. S. 41; *Pierce* v. *Emory*, 42 N. H. 487; *Snell* v. *Chicago*, 133 Ill. 413.

Corporate existence is itself a franchise belonging to the members of the corporation, and a corporation, being a franchise, may hold other franchises as rights and franchises of the corporation.  *Snell* v. *Chicago*, 133 Ill. 413; *Pierce* v. *Emory*, 32 N. H. 484; *California* v. *Railway Co.* 127 U. S. 40.

The franchise to be a corporation of the kind and description stipulated in the charter vests in the members who become incorporated, and not in the corporation. *Regents* v. *Williams*, 9 G. & J. 365; *Fietsam* v. *Hay*, 122 Ill. 293; *Snell* v. *Chicago*, 133 id. 413.

The essential properties of corporate existence are quite distinct from the franchises of the corporation. *Railway Co.* v. *Commissioners*, 112 U. S. 609.

The act of changing the articles of association, like the act of agreeing to them, is not a corporate act of the corporation but an act of contract of the members.  They may delegate such an act to officers but they are not obliged to, and, in performing such an act, the officers are agents of the members rather than corporate functionaries.  *Byrne* v. *Electric Co.* 65 Conn. 336; *Allerton* v. *Railway Co.* 18 Wall. 233.

General authority to make, alter or repeal all by-laws does not authorize the delegated body to make changes in the fundamental features of the articles of association. *McNulta* v. *Bank*, 164 Ill. 427; *Stevens* v. *Davison*, 18 Gratt. 819; *Livingstone* v. *Lynch*, 4 Johns. Ch. 573; *Allerton* v. *Railway Co.* 18 Wall. 233.

So it was held in *Allerton* v. *Railway Co.* that a power to exercise all the corporate acts of the society did not invest the directors with power to make changes in the articles of association.  And in *Venner* v. *Railway Co.* 28 Fed. Rep. 589, it was held that power to perform all corporate acts did not authorize fundamental changes in the plan of doing business.

In partnership and general association the majority cannot change or alter the fundamental articles of partnership against the will of the minority, however small, unless there is an express or implied provision in the articles themselves that they may do it. The same principle applies to corporations. *March* v. *Ballard,* 43 N. H. 515; *Livingstone* v. *Lynch,* 4 Johns. Ch. 573; *Byrne* v. *Electric Co.* 65 Conn. 336; *Zabriskie* v. *Railway Co.* 18 N. J. Eq. 178; *Allerton* v. *Railway Co.* 18 Wall. 233; *McNulta* v. *Bank,* 164 Ill. 427; *Eidman* v. *Bowman,* 58 id. 444; *Insurance Co.* v. *Knight,* 162 id. 470.

The consent of the members of the corporation to the making of material changes in the fundamental articles is not to be presumed, but must be proved. *March* v. *Ballard,* 43 N. H. 515; *Eidman* v. *Bowman,* 58 Ill. 444; *Allerton* v. *Railway Co.* 18 Wall. 233.

Inasmuch as the act of making essential changes in the articles of association or charter of the corporation is the same, in its nature, as the act of framing the articles of association in the first place,—*i. e.,* an act of contract, —such changes cannot be made without the unanimous assent of the incorporators or members. *Livingstone* v. *Lynch,* 4 Johns. Ch. 573; *Byrne* v. *Electric Co.* 65 Conn. 336; *Zabriskie* v. *Railway Co.* 18 N. J. Eq. 178; *Allerton* v. *Railway Co.* 18 Wall. 233; *Bastian* v. *Modern Woodmen,* 166 Ill. 395.

Acquiescence by shareholders in steps illegally taken by officers, no matter for how long a time, affords no presumption of legality. *March* v. *Ballard,* 43 N. H. 515.

A member is not estopped from questioning an act which affects him by having known and acted upon or in conformity with or obedience to the performance of the same act in the same way on former occasions. Such an act cannot ripen into a right. *Insurance Co.* v. *Knight,* 162 Ill. 470; *Railroad Co.* v. *Lapham,* 18 Barb. 312; *March* v. *Railroad Co.* 43 N. H. 515.

It is doubtful if the legislature can authorize the performance of a strictly corporate act by a corporation

beyond the State boundary in such a way as to bind members. (*Bastian* v. *Modern Woodmen,* 166 Ill. 595.)  But it is clear that the legislature is powerless to authorize the corporation or its officers to make changes in the articles of association without the consent of the members (where no such power is reserved) without the State, not merely because of the extra-territorial feature, but because the legislature has no power to invest the officers with such a power.

A legalizing act which attempts to give force to such action taken by officers or an official body of a corporation impairs the obligation of a contract and contravenes the Federal constitution. *Regents* v. *Williams,* 9 G. & J. 365; *McDaniel* v. *Cornell,* 19 Ill. 226; *Sykes* v. *People,* 132 id. 32.

All members of the corporation do not necessarily stand in the same position.  A member who joins after a given date cannot complain of an illegal act done before he became a member, unless it is void.  But charter members may require the officers to adhere to the charter. *Marsh* v. *Railway Co.* 43 N. H. 525; 28 Fed. Rep. 581.

A corporation cannot change its location from any city where any of the inhabitants have "donated or in any manner contributed any money or any other valuable thing to induce such corporation" to locate.  (1 Starr & Cur. Stat. chap. 32, par. 65.)  This section applies to corporations not having capital stock.  Ibid. par. 70.

The legalizing clause of section 10 of the statute of 1897 is not expressed in the title, and is void.  1 Thompson on Corp. sec. 619; *Williamson* v. *Keokuk,* 44 Iowa, 88; *Brieswick* v. *Mayor,* 51 Ga. 639.

Said section is void because it is special legislation. The same privilege might have been conferred upon all corporations by a general law.

HARVEY HURD, for appellees:

The change of the principal place of business from Fulton to Rock Island was made in accordance with the

rules of the association regularly adopted, and is therefore conclusive upon complainants. Hurd's Stat. 1892, sec. 297, p. 876; Hurd's Stat. 1897, secs. 264*a*, 267, p. 971; *Bastian* v. *Modern Woodmen,* 166 Ill. 595.

To entitle a member of an association to invoke the aid of a court of equity as against the action of the association in which he does not concur, he must show a pecuniary injury to his membership, as distinguished from its effect upon the association as a whole. *Railroad Co.* v. *Zimmer,* 20 Ill. 654.

The charter of a corporation formed under such a general law does not consist of the articles of association alone, but of such articles taken in connection with the law under which the organization takes place. *People* v. *Chicago Gas Trust,* 130 Ill. 268; Morawetz on Corp. sec. 318.

When one becomes a member of such an association he is presumed, as a matter of law, to know that the general law under which the association is organized may be amended by the legislature, and that the association may accept such amendment in any recognized way. *Railroad Co.* v. *Zimmer,* 20 Ill. 654.

An incorporation act may be amended to almost any extent not destructive of the principal purposes of the incorporation, or to divert the investment of the stockholder, or take away his property without compensation. There is a clear distinction between such an amendment, which is termed auxiliary, and one which changes the investment or takes away property rights, which is called fundamental. *Railroad Co.* v. *Zimmer,* 20 Ill. 654; *Sprague* v. *Railroad Co.* 19 id. 174; *Barrett* v. *Railroad Co.* 13 id. 504; *Railroad Co.* v. *Renshaw,* 18 Mo. 210; *Railroad Co.* v. *Hughes,* 22 id. 291; *Fulton County* v. *Railroad Co.* 21 Ill. 338; *Ross* v. *Railroad Co.* 77 id. 127; Cook on Stock and Stockholders, (3d ed.) sec. 499; *Venner* v. *Railroad Co.* 28 Fed. Rep. 581.

J. G. Johnson, and Jackson & Hurst, also for appellees.

Mr. JUSTICE PHILLIPS delivered the opinion of the court:

The purpose of this society, and its action with reference to an attempt to change the location of its principal office from the city of Fulton to the city of Rock Island, and the legislation under which such attempted change was sought to be made, are stated and set forth in *Bastian* v. *Modern Woodmen of America*, 166 Ill. 595, where it was held that where an incorporated benefit society has by its fundamental law fixed its principal office at a place designated in its articles of association, such principal office cannot be changed without the amendment of its fundamental law and its articles of association; that such change of its articles of association must be made in accordance with methods assented to by its members, and that statutory provisions relating thereto must necessarily be observed; that in the absence of a statute to the contrary, a corporation has no power to perform strictly corporate acts outside of the State of its creation. It was further held in that case that section 10 of the act of 1893, concerning benefit societies, was in conflict with section 18a of the act of 1887 as added by the act of 1893, and repeals the conflicting provisions of that section; that a benefit society organized in this State, which had applied for permission to continue business under the act of 1893, concerning benefit societies, was prohibited by section 10 of that act from changing the location of its principal office at a meeting held in another State. It was further held that an unauthorized and illegal removal of the principal office might be enjoined by members of the society who contributed to its support and were interested in its funds.

It is unnecessary to repeat or discuss the legislation under which this organization was acting, but that case, in its discussion of the question as to the powers of this organization under the law of this State in force prior to the time of that opinion, must be considered conclusive.

In 1897 an act was passed (Laws of 1897, p. 237,) entitled "An act to amend an act entitled 'An act to provide for the organization and management of fraternal beneficiary societies for the purpose of furnishing life indemnity or pecuniary benefits to beneficiaries of deceased members, or accident or permanent indemnity disability to members thereof, and to control such societies of this State and of other States doing business in this State, and providing and fixing the punishment for violation of the provisions thereof, and to repeal all laws now existing which conflict herewith,' by adding thereto an additional section hereby designated as section $7\frac{1}{2}$, and amending sections 10 and 12 thereof." The additional section $7\frac{1}{2}$ and amended section 10 are as follows:

"Sec. $7\frac{1}{2}$. Any corporation, association or society organized under the provisions of this act amended by this section, may change its article of association in the manner prescribed by its own rules, but no such change shall be of legal effect until a certificate setting forth fully and definitely the changes proposed shall have been submitted to and approved by the insurance superintendent and filed in the office of the Secretary of State, and a certified copy thereof recorded in the office of the recorder of deeds in the county in which the original certificate of association was recorded. Every corporation, association or society organized, having adopted such change in its articles of association, shall comply with the provisions of this section within sixty (60) days."

"Sec. 10. Any such society organized under the laws of this State may provide for the meeting of its legislative or governing body in any other State, province or territory wherein such societies shall have subordinate bodies, and all business that has heretofore or may hereafter be transacted at such meetings shall be valid, in all respects, as if such meeting was held within this State; and where the laws of any such society provide for the election of its officers by votes to be cast in its subordi-

nate bodies, the votes so cast in its subordinate bodies in any other State, province or territory shall be valid as if cast in this State: *Provided, however*, that all meetings held within this State, in any such society organized under this law or heretofore organized, no member shall be allowed to cast more than fifteen votes by proxy on any question submitted therein."

This act was approved May 27, 1897, with an emergency clause. By this legislation any society organized under the provisions of the act was authorized to change its articles of association in the manner prescribed by its own rules, and was further empowered to provide for the meeting of its legislative or governing body in any other State or territory wherein the society should have subordinate bodies, and it declared all business that had theretofore been or might be thereafter transacted at such meetings should be valid in all respects, to the same extent as if such meetings were held within this State, and rendered valid all acts done with reference to changing the place of its principal office, and empowered the society to do what was held in *Bastian* v. *Modern Woodmen of America, supra*, could not be done, and legalized the action of such society in attempting to effect such removal, by which the illegality of the act, as held in that case, was obviated.

The appellants insist that the legalizing clause of section 10 of the act above is void because not expressed in the title of the amendatory act, and is special legislation. As to the first objection, it is sufficient to say that if all the provisions of the act relate to one subject, which is indicated in its title, and the parts of the act are incident to and reasonably connected with the subject indicated and are reasonably auxiliary thereto, then the act may include details of legislation with reference to that subject matter so indicated without the title being a mere index of everything contained therein. The provision of the constitution cannot be so narrowly construed as to

require the title of an act of itself to contain the entire act. It is sufficient if the title of the act suggests the subject matter; then it includes all that is reasonably auxiliary thereto. The title of this act is sufficiently full and complete to include all the subjects embraced therein, not excepting what is termed retrospective legislation.

An act which affects all corporations or persons within the particular class towards which the legislation is directed, and is general,—applicable to all belonging thereto,—is not obnoxious to an objection as being special legislation. Because it is directed to a particular subject, including all persons that may be within a particular class to which the subject applies, does not constitute the act one having reference to a special subject and does not render it special legislation. Where the legislature enacts a law with reference to a particular subject matter, and authorizes acts to be done which are not, in and of themselves, jurisdictional with reference to a person or property, it may by curative legislation approve and render valid any act done which it had power to originally authorize, and which may have been done theretofore under a supposed power and authority. If something is done or omitted constituting a defect in a proceeding, which might have been authorized or dispensed with by the legislature, a subsequent curative statute authorizing or dispensing with such act done or omitted renders the act valid. If something is done which might have been made immaterial by the legislature, that body, by a subsequent law, may cure a defect existing because of such immateriality and render the same valid. If that body has power to authorize a particular act to be done, it may by a subsequent act render valid an act so done without a power theretofore conferred. (*Town of Fox* v. *Town of Kendall,* 97 Ill. 72.) But this power does not extend to a jurisdictional question where the rights of persons are involved, which can only, under the constitution, be taken under due process of law. The prin-

ciple is, if a property right is asserted, whether inherent in a natural person or conferred by law upon an artificial person, the question is presented, has the legislature renounced the right to legislate further with reference to the subject matter or to subject it to further control? If so, a property right is secured either to a natural or an artificial person; but if not, a mere naked right has been granted, which is subject to governmental regulation, which may be dealt with as the public good may require, by the law-making power, in the same manner as with reference to all other rights.  In *Bank of the Republic* v. *County of Hamilton*, 21 Ill. 53, it was said (p. 59): "If, in a law creating an artificial being, rights or powers are conferred upon it, which, by the express terms of the act or by reasonable intendment, shall not be taken away or modified by a subsequent law without the consent of the corporation, that becomes what has been termed a charter contract, and becomes a property in the hands of the corporation, and is protected by those constitutional provisions referred to; but unless there be such express provision or reasonable intendment that such right or faculty shall not be touched by subsequent legislation, it is held in the same subordination to governmental control to which the rights and faculties existing in natural persons are subject." The legislation above quoted, and the right to amend the charter of this corporation, were valid, and clearly within the power of the legislature.

Appellants contend that the change of the principal office of this corporation could not be made without the consent of its members; and further, that a contract outside the articles of association had been entered into between the promoters and the early members, fixing the location of the principal office at Fulton, and hence no change could be made of that principal office except by the unanimous consent of its members.  It is further insisted, that by reason of donations made to the corporation by residents, citizens and inhabitants of Fulton, no

change could be made of the principal office from that
city, even with the consent of all the members of this
corporation, without the consent of the residents, citi-
zens and inhabitants of Fulton. And it is finally urged
that there is no provision in the articles of association,
or of the statute under which the association was incor-
porated, allowing a change of the location of the princi-
pal office to be made by less than all the members, and
hence it is urged that the consent of all must be had.

Prior to the act of June 22, 1893, there was no law au-
thorizing the head camp of an incorporation existing by
virtue of the laws of this State to transact business at
a meeting held outside of this State. By section 10 of
the act last mentioned such society organized under the
laws of this State might provide for the meetings of its
legislative or governing body in any other State, and all
business theretofore or that might thereafter be trans-
acted at such meetings, except so far as the same may
relate to the removal of the principal place of business,
shall be as valid in all respects as if such meetings were
held within this State. At the meeting of the head camp
of the Modern Woodmen of America held at Madison,
Wisconsin, in June, 1895, certain proceedings were had
and the following resolution was adopted:

"*Resolved*, That the rule of this corporation with regard to
amendments to the articles of association of this corporation
be and is declared to be as follows: That the board of directors
of this order have power, and they are hereby required, to
amend the articles of association and the fundamental law
of this order in such particulars as the same may be directed
to be done by vote of two-thirds of the members of the head
camp, by its certificate signed by the head consul or head clerk
and attested by the seal of the corporation, and that this reso-
lution or rule take effect from and after its passage."

The exception in the act of 1893 being left out of the
amendment of 1897, and the provisions of section 7½ hav-
ing been incorporated in this statute by that amendment
of 1897, at a meeting of the head camp held at Dubuque,

Iowa, on the second day of June, 1897, a resolution was adopted by a two-thirds vote changing the articles of association by striking out the name "Fulton" as the location of the principal office and substituting therefor "City of Rock Island," and directing the board of directors, head consul and head clerk to make, under the seal of the corporation, a certificate of such change, and have the same recorded as required by law. The certificate was so made within sixty days and approved by the insurance superintendent and filed in the office of the Secretary of State, and a copy thereof was also filed in the office of the recorder of deeds of Whiteside county. This action of the head camp at Dubuque was in accordance with the resolution adopted at Madison and a compliance with section 7½ of the amendatory act of 1897, and was authorized by section 10 of the latter act.

The persons who constituted the charter members of this society have no rights which are not common to the other members of the association. This association, having its origin in a single camp composed of a small number of persons, has been extended until now there exist thousands of camps, extending over more than twenty States and including a membership of over 290,000. The manner of government of the entire body differs from the ordinary corporation for pecuniary profit. But this corporation not organized for the purpose of pecuniary profit, could not possibly carry out any legislation with reference to any change except in the manner designated in the act under which it is organized, to-wit, the act of 1893 and the amendments thereto, which have been accepted by it. Under those statutes the plan of the association as expressed in its articles and fundamental law, and acted upon from the beginning, could not and did not contemplate a meeting of its vast membership in one body. The legislative power of the association was therefore vested in the head camp,—a body composed of certain officers and representatives of the membership,

chosen by the members themselves from local camps,—
and to the body as thus organized the power to exercise
full authority in all matters pertaining to the weal and
welfare of the association in all matters not otherwise
provided for in the fundamental law is given. The dele-
gates and certain officers assembled in a head camp in
the way prescribed by the rules of the association could
lawfully act on all matters delegated to that body un-
der the articles of association and its rules, and under
the statutes under which they were organized and the
amendments thereto, and the action of such head camp
was the action of the members of the association. The
head camp might, therefore, under this amendatory leg-
islation of 1897, and under the action taken at Madison
and Dubuque, lawfully change the location of the prin-
cipal office, and such action is valid and binding on the
members of the association. In so doing their action is
not in conflict with anything said in *Bastian* v. *Modern
Woodmen of America, supra.*

What is here said disposes of the allegations of the
bills of Anthony W. Bastian *et al. v.* Modern Woodmen of
America *et al.*, and of the bill of Leroy Baker *v.* Charles
W. Hawes and Modern Woodmen of America.

By the bills of Oscar Park *et al. v.* Modern Woodmen
of America *et al.*, City of Fulton *v.* Modern Woodmen of
America, and Parker J. Bennett *v.* William A. Northcott
*et al.* and the Modern Woodmen of America, it is averred,
in substance, that a secret fraternal society first came
into existence at Lyons, Iowa, in 1883, and it is alleged
that twenty-one persons, constituting the sole member-
ship of the society of the Modern Woodmen of America,
elected Joseph C. Root head consul, Lewis G. Blaine
head banker and Albert Hilton head clerk, which last
named officers constituted an executive committee, with
power to make and execute contracts. The bills allege
that a proposition was made to the citizens of Fulton,
Illinois, that the Modern Woodmen of America would

become organized under the laws of the State of Illinois and establish its principal place of business at Fulton if the citizens and inhabitants would donate or contribute toward the society certain sums to pay for the obtaining of a charter in Illinois, to purchase a corporate seal, furnish an office for the principal place of business for a period of one year, pay the salary of a head physician for one year, and contribute towards the society necessary sums to keep it in running order, and would organize a local camp; that the Modern Woodmen of America would then, as soon as practicable, become incorporated under the laws of the State of Illinois, and would move its principal office from Lyons, in the State of Iowa, to Fulton, Illinois; that the inhabitants of Fulton agreed to accept said proposition, and organized Forest Camp No. 2, and paid the necessary funds for the incorporation of the society under the laws of the State, and there were paid by certain individuals certain small sums of money in carrying out the alleged contract, and paid for the head physician and for office rent for one year, with other expenses; that said society became incorporated in pursuance of said agreement, and named in the articles of association Fulton, in Whiteside county, in the State of Illinois, as its principal place of business; that said contract was reduced to writing. The proposed removal of the principal office is then alleged in these several bills.

There is no evidence in this record showing any contract reduced to writing, and its destruction, as alleged in several of these bills, by which the principal office was to be kept at Fulton, in Whiteside county, Illinois. The weight of proof tends to show that no such agreement in writing ever existed. The contract, as set out in the bills, is, in effect, an allegation that the promoters of this incorporation who had incorporated its first camp at Lyons, Iowa, proposed to move the principal office to Fulton, Illinois, and retain the principal office at that place for certain alleged considerations. The considera-

tions alleged to have been paid, so far as the allegations
of these bills are concerned and so far as set forth there-
in, and under the proof in this record, might be disposed
of by the application of the maxim *de minimis non curat
lex.* With reference to those allegations, it is sufficient
to say that under the averments of the bills a contract
is alleged to have been entered into by the promoters of
this corporation before the incorporation took place, be-
cause of which, in consideration of certain expenditures
being made by certain citizens and inhabitants of Ful-
ton, its chief office should be located in that city. The
decided weight of authority is that contracts of this
character, made by the proposed promoters of a corpora-
tion, do not render the latter liable thereon. The rule is
well stated in Cook on Stockholders, (sec. 707,) where it
is said: "Any other rule would be dangerous in the ex-
treme, inasmuch as promoters are proverbially profuse in
their promises, and if the corporation were to be bound
by them it would be subject to many unknown, unjust
and heavy obligations. The only protection of the stock-
holders and of the subsequent creditors against such a
result lies in the rule that the corporation is not bound
by the contracts of its promoters. The rule is just and
should not be weakened." This principle is in effect sus-
tained by *Seeberger* v. *McCormick*, 178 Ill. 404.

Whilst contracts of this character made by a promoter
may be ratified by the corporation, and the benefits it has
accepted may be enforced against it to the extent that it
may be rendered liable for damages for failing to comply
therewith where there is such a ratification, yet all sub-
sequent members or stockholders cannot be precluded or
the welfare of the corporation jeopardized or prejudiced
by requiring it to perform some contract perpetually,
where the interests of almost every person connected
with the association or corporation may be disastrously
affected thereby. In case of ratification, compensation
may be had in damages for a violation thereof. It is

averred in the last three named bills that in the articles of association the place of the principal office was fixed at Fulton. This is, however, not averred to be a ratification of the contract of these promoters. It appears that on the application to the Secretary of State for a certificate of incorporation the place of the principal office was left blank, and that a certificate was refused by the Secretary of State because of such omission, and thereupon the city of Fulton was inserted as the place of the principal office. The pleading must be taken most strongly against the pleader, and the allegations of these bills do not amount to an averment of a ratification by the corporation.

As to the bill filed by the city of Fulton, that municipality is not authorized to sue in behalf of the citizens, residents and inhabitants thereof because of the alleged donations they may have made to the promoters of or to the Modern Woodmen of America. That municipality of itself could not extend municipal aid and benefit under the constitution, and it is not authorized to sue on behalf of inhabitants, residents or citizens thereof, and seek to protect their interests by litigation conducted in its name which may be attended with costs.

We cannot agree with the contention of the appellants that the consent of all the members of this association must be had before a removal of the principal office could be effected. To so hold would render the action of a single member sufficient to prevent the action of all the other members, and is not in accordance with the purpose of the articles of association, the statutes under which it is acting, or its welfare. One becoming a member of this association must know that the charter of the company is not unalterable. He must take notice of the fact that it is liable to be amended by the legislature, and that the company might accept such amendment. By his contract when he became a member, not only was there incorporated therein the provisions of the statutes

of the State as they then existed, but he is held to recognize the further principle that there is the right in the legislature to change the provisions of the charter as public good and the interests of the company may require. (*Illinois River Railroad Co.* v. *Zimmer*, 20 Ill. 654.) One becoming a member with this knowledge cannot assert a right in himself as existing which would prevent the acceptance of any legislation that might be adopted for the welfare of the association, and hence a single objection cannot take away the right of the corporation to accept this amendatory legislation and act thereon, thereby changing the place of the principal office. Neither can the objection of one or more members deprive the legislature of the State of its power to regulate, control and direct the procedure or powers of an artificial person created and brought into being by it. The object of the corporation, as stated in the statute and its articles of association, is the furnishing of life indemnity and pecuniary benefits to the widows and heirs of its members. Its manner of conducting its business, as between its members and the association, is through its local camps. There is no direct association between the member and the head camp other than through the representatives of the local camp in the head camp. The head camp, composed of officers and delegates, directs the policy of the local camps. The location of the principal office of the association is not a part of its plan for the benefit and advantage of an individual member of a particular camp. The principal place of business is more one of public convenience, for the general good of the association, and no individual member can acquire a right or interest as to the location of the principal office which is against the general good of a great majority of his fellow-members and the general benefit of the association.

Appellees gave notice of a purpose to move a dissolution of the injunction in the case of the city of Fulton as complainant, as also in the case of Parker J. Bennett,

complainant, and in the case of Leroy Baker, complainant, in vacation.   The appellants, on appearing before the judge in accordance with this notice, entered a motion for a change of venue, which was denied, and that is assigned as error.   Subsequently the cases proceeded to a hearing on bills and answer before another judge at a regular term of the Whiteside circuit court.   A term had intervened between the dissolution of the temporary injunction and the subsequent hearing on bill, answers, replications and proofs.   These appeals do not bring before us the question of the change of venue, nor is there incorporated in the certificate of evidence the facts on which the judge acted.

Under the evidence appearing in this record and under the legislation applicable to this corporation there was no error in the circuit court in dismissing the bills for want of equity.   The decree of the circuit court of Whiteside county is affirmed.

*Decree affirmed.*